All right, we'll begin. On behalf of the panel, we thank you for participating in this somewhat unusual method of proceeding. But we think it'll be a helpful way for us to have a discussion about your case today. And with that in mind, we'll hear for counsel for Mr. Watson. Good morning, your honors. May it please the court. Brian Biggs, pro bono counsel for Mr. Watson. If I may, I may request four minutes reserved for rebuttal. I'll be granted. Mr. Biggs. Defendant's policy denying Mr. Watson any access to fill in while incarcerated for his morning prayers violates our LUPA because other less restrictive policies are available. The district court below erred in three material respects with respect to the our LUPA claim. First, it misallocated the rule 56 burden. Second, it did not hold defendants to their exceptionally demanding burden to prove least restrictive means. And third, it disregarded Mr. Watson's three genuine disputes material fact, which should have precluded summary judgment. And because of these three errors, the district court erred in another way in summarily granting summary judgment on the constitutional claims. And if I may, your honors, I intend to just focus my remarks today on the second and third errors, exceptionally demanding burden, and then the errors of the genuine disputes of material fact. Our LUPA requires that the government do more than simply mull over a request from a claimant. It requires a focused inquiry that is grounded in evidence where other alternatives are considered and either accepted or rejected. Isn't that exactly what the district court did, was presented with deposition testimony that described the alternatives to his request, either keep it in a cell, keep it elsewhere, but have it supervised when used in the cell, have it used in another place in the institution under supervision? Didn't the district court do that and look at the evidence and make its conclusion? Your honor, the district court did that, but then weighed facts and made factual determinations inappropriate on summary judgment. Were any of them rebutted? Weren't they all undisputed when they ultimately concluded the proposed alternatives were not feasible because they didn't have the staffing? What's rebutted about that? It's unrebutted, isn't it? Your honor, those were rebutted. There was testimony by the defendants. Defendant Brennan, for instance, testified that they could mitigate the risk sufficiently to allow to fill in some sort of supervised access. Defendants Brennan and Scarborough testified that, I'm sorry, defendants Scarborough testified that there was sufficient staffing, and defendant Brennan testified that with the staffing, it would be hard, but not impossible. So the feasibility analysis is necessarily a factual inquiry that the district court should not have found on summary judgment. What is the district court supposed to do with Cutter and its express statement there's supposed to be deference given to the prison officials in certain circumstances? Yeah, your honor, that is addressed in Holt and then again in Yellow Bear, that while deference is given, deference is not unquestioned. And while the deference should be given to the prison in regard to how it weighs in logical interests, it still requires this exceptionally demanding burden when it conducts this focus inquiry. And what defendants did not do here is do anything more than the post hoc rationalizations, the mere speculation that the legislative history warns against and that Yellow Bear and Holt also warn against. Here, the defendants did not conduct any studies about the alleged danger of deference. In fact, they never even procured the deference in making their determination. So let's say it wasn't Teflon, but let's say it was like a kerpong. Kerpong is like a four inch knife. I think Sikhs are required to, would they have to do a study, detailed study to say inmates can't carry kerpongs? Well, your honor, that is not a factual record before us today, but- No, no, it's a hypothetical because you said that the reason that they couldn't meet the least restrictive means test is because they didn't do detailed factual studies of Teflon. And so my question to you is, where does the detailed factual studies point of law or requirement derive from? Because if it was a kerpong, I guess you're saying that if that's a matter of law, they'd also have to do that to say you can't carry a four inch blade for religious reasons in prison by, in a maximum security prison either. Certainly the focused inquiry that Holt requires may not require a study, a commissioned study in the instance of a kerpong. But here where we're talking about Teflon, which has straps that could use as ligature, while the prison already allows similar objects like the two foot long leather chain, I'm sorry, two foot long silver chain and other dangerous objects like a cross, there necessarily needs to be that focused inquiry, whether it is a commissioned study will depend upon the circumstances. Here we submit that a study would have been appropriate to at least consider what other prisons are doing. Several other prisons, we know five in the record have permitted Teflon, including in two of them in segregation. But have they included them in a segregated special unit like we have here with the nature of this inmate population with the particular requester and his history? Isn't this exactly this kind of circumstance where you have to give deference to the prison officials where those other cases, it might've been fully appropriate to allow access to Teflon, given where it would be used in the nature of the inmates who would have access to it as compared to this circumstance. Isn't exactly what we're supposed to defer to the prisons about. I disagree your honor in that the factual inquiry that your honor is asking about is one that is inappropriate again on summary judgment. The factual inquiry as to whether, and let me be very clear about the accommodation that was being considered. We're talking about the Teflon that was provided in Spiegelman and Searles for instance. In Searles, that inmate was a convicted first degree murderer. So for the Department of Corrections, for the defendants to suggest that the circumstance here where Mr. Watson is not a convicted first degree murderer, where Mr. Watson is in isolation and will be supervised while he's accessing Teflon for 15 minutes a day, is that factual inquiry that necessarily is inappropriate on summary judgment. That should be decided by the fact line. So you're saying the jury should decide whether your proposed alternative, despite the evidence concerning resources and staffing, that the jury should decide that issue? Or are you also saying the jury should also determine whether the components of Teflon pose a risk? You think all of it should go to the jury? Whether it's the jury or the judge as fact finder, yes, we think that the disputes of fact that Mr. Watson has presented here should be presented to the jury to determine whether the policy, the outright denial of the Teflon at all for the rest of Mr. Watson's life is the least restrictive means of securing safety in prison. To what extent do we have to, and did the judge give a consideration to the personal history? I'm not talking about the crimes themselves, but the personal history in the prison, the attempted escape, removing his restraints with a makeshift key, trying to go through the sewage tunnel. Additionally, he was found with razor blades on his person on two different occasions and other sharpened bits of metal as well. He's threatened to kill officers and medical staff. He's attempted suicide twice, told an officer that he was suicidal. My question is, to what extent are these relevant? And second, did the prison officials take this into account? And should they have, if they didn't, should they have taken it into account? Your Honor, that second question is an important one. The prison officials did not take those facts into account when in 2018, they declined to provide Mr. Watson any accommodation. What the prison took into account at the time was simply that he was located in the RTU, the residential treatment unit, and, pardon me, that he was in the RTU. They did not take into account- But they considered this twice. They considered it once and then they reconsidered it. And they, are you saying they weren't aware of all of these items that I've just listed here? Yes, Your Honor. There were two determinations. In 2016, it was a summary determination where defendant Pierce looked at the defendant and said, no, did not take into account Mr. Watson's personal status at all. In the second inquiry in 2018, the prison took into account Mr. Watson's location in the RTU, but they did not look at his history. They did not look at his medical history. They did not look at any other distinguishing factors about Mr. Watson other than his housing status. But doesn't his housing status come about in part because of these acts of sort of his history? When they make a clarification, right? They consider the person's background. The record evidence does not suggest that everybody in the residential treatment unit is necessarily dangerous. And it would be, Holt requires that it be a focused inquiry about that particular claimant. And so for, to Judge Sirica's question, for the prison to conduct the Arlupa analysis as required by Holt, they need to take into account Mr. Watson, his request, an accommodation specific to Mr. Watson. They did not- But also, I mean, Holt also says, I mean, just to make clear that, you know, prisoners don't get an accommodation and then abuse the accommodation. Part of the outro of Holt says, even if a claimant's religious belief is sincere, an institution might be entitled to withdraw an accommodation if the claimant abuses the exemption in a manner that undermines the prison's compelling interests. And I think Judge Sirica's point went to, well, do we have to do this analysis always after the fact? Or can we see a prisoner who's already abused some of the prison process and say, well, that counsels against ever granting an accommodation as opposed to granting an accommodation only to have a prisoner abuse the trust that was given? I mean, sooner or later, foresight has to count for something, right? Certainly, Your Honor, but I read Holt to suggest that the prison- I just quoted Holt. I just quoted Kat, though. Yes, Your Honor. But the way that I understand that passage from Holt to apply here would be that the prison should not rely on simply speculation to suggest that Mr. Watson is going to use this as a bill in which, you know, it's used for prayer, right? This is a religious object. This is not- This is not- It's intended use as prayer. It's intended use as prayer. It's intended use as prayer. That should Mr. Watson receive the accommodation and then misuse it, then certainly the prison can take it away. But- Well, it's more than that. As one of the prison administrators said, we can grant these accommodations and it may work until it doesn't. And until it doesn't may mean killing himself or killing some guard or some other inmate. And what the defendants failed to do here is actually take that into account when making the decision. When they looked at his housing status, they did not look at the rest of Mr. Watson. So all this additional evidence is the post hoc rationalization that the legislative intent of our Lupa suggests is inappropriate here. Instead, what the defendant should have done, look to what other prisons do. Defendants below did not provide any evidence that anyone who has been provided to fill in in any of the prisons has ever used it in a dangerous way. The defendants below did not conduct any studies. And we've talked a lot about the dangerousness, but defendants admitted that they could mitigate this risk with supervised access. Defendant Scarborough and defendant Brennan, their testimony together, they say they could mitigate this risk to a way that- But perhaps putting other prisoners in peril who may have suicide attempts or assaults, they were pretty clear that it wasn't, the guards there had to take care of more than just Mr. Watson. That's certainly the case, Your Honor. But the accommodation that was considered was Mr. Watson in isolation, using it for prayer in his cell. So that mitigates the risk to other prisoners. And again, to compare it to other dangerous religious objects that the prison allows, the cross and chain, which prisoners are allowed to maintain on their person 24-7 around other prisoners, suggests that this accommodation, the risk can be mitigated to an extent that as defendant Brennan, pardon me, testified, to the point where those danger concerns are no longer overwhelming. Those danger concerns- Thank you, counsel. Let me just see if Judge Sirica or Judge Phipps have any further questions before we have you back. No, we don't. Okay, counsel, we'll have you back up on rebuttal. Good morning, members of the court, counsel. George Lees on behalf of the Delaware Department of Justice and the appellees. I think the court has recognized and focused in on that this is not a policy as institution-wide at James T. Vaughan Correctional Center or JTVCC. This is a denial of a item specific to an individual who has a longstanding history within the institution of impermissible conduct. He is an individual who has been found incompetent to stand trial in the courts in Maryland. This is an individual who escaped and his rationale for escape when being transported to a competency hearing in Maryland was that a snake told him to. So we are not dealing with, as my esteemed colleague would posit, an individual who is simply in an institutional setting because of committing a heinous act. Apropos of what Judge Zirica asked your adversary, what in the record would inform us that the decision-makers consider those unique factors as to this particular inmate? Your Honor, I think if you look at the appendix A-207, which is, it's page 22, it's Major Brennan's deposition testimony, where Major Brennan discusses that he, in fact, did look at the disciplinary history and that it was researched. So this is not just simply a, he's in RTU, the Residential Treatment Unit. This is looking at the disciplinary history as well. Now, candidly, Major Brennan was deposed many, many months after they made the decision to deny the tefillin to Mr. Watson. So his recollection of the specifics of Mr. Watson's disciplinary history may not have been as precise, but then again, the history which had been produced wasn't also placed in front of him and the questions posited to him of, did you consider this, did you consider that? So the totality of the record is that Major Brennan did, in fact, state they pulled the disciplinary record and reviewed it. Going back, again, my adversary has referenced at several different times that this is, in fact, a policy of JTVCC. I think that that representation or argument is belied by the record because it's not, in fact, a broad-sweeping policy at JTVCC. There is, in fact, a permission or permitted use where tefillin is allowed to be brought onto the compound. It is used by inmates with a lower or lesser security classification in the chapel under the supervision of rabbinical students from the Aleph Institute. So- Is that in the record? That is in the record, Your Honor. That is, in fact, in the record at Appendix A-225. Thank you. Absolutely, Your Honor. So- Can I ask a question? What if appellant's request wasn't to use tefillin every morning for prayer? Let's say he just wanted to use it one morning a year. Maybe yesterday morning was a day that was of particular importance to him, and he asked only to have it one day out of the whole year. Could the prison accommodate that? Even given his personal history and even given everything else, surely they could find 15 minutes out of the year amid its funding and its staffing needs to let him have tefillin one day a year, right? Your Honor, that question was never asked, but in candor to the court and counsel, I think that that is the type of thing that Major Brennan and Warden Scarborough commented that, you know, in a limited situation, that type of accommodation may, in fact, be able to be made. The concern here was a concern because of the security issues involving the tefillin, and I'll address that a little bit later, but also the staffing issues, which are well-publicized and were testified to of 6,400 hours of overtime a week back in 2018 at just JTVCC. And just to put that in perspective, 6,400 hours of overtime is quite a bit, but adding an extra, what, hour and 45 on to that I don't think is gonna cause anyone deficit spending concerns additional concern. I mean, if you're already at 6,400 a week and he's asking for an extra hour and a half, essentially, or maybe only 15 minutes, that doesn't seem to be the sort of funding concern that we're talking about. If this was that he wanted it for everyone in the whole prison, you could make a case. But here, an hour and a half out of 6,400 isn't that much. Your Honor, it's not just the 15 minutes, and I think that the testimony spells it out, that it's the time spent with that individual offender while also having to deal with the other operations going on in the RTU. And the concern that it is posed with that particular piece of equipment, the Tefillin, that it's not only securing it, providing it to him, giving him his time and accessing to it, whether that be in his cell, which includes one set of concerns, versus outside of his cell, which is then requiring a transport. So it is, in fact, more time, I think, than just the 15 minutes. So if he wanted it one day a year, if he wanted it one day a year, though, would you say that even that's too much? No, Your Honor. In fact, and if I wasn't clear on this, I apologize. I think that Major Brennan and Warden Scarborough say that we could probably accommodate something akin to one day a year. It's the 15 minutes every day that was requested, and that was what the request was, and it was problematic. But the answer seems to be then not, the answer seems to be somewhere in the middle then, right? Because least restrictive means suggests that something more than zero is possible, but maybe not as much as appellant wants is possible. But least restrictive means asks us to look for the lowest feasible, actually more than feasible, but lowest common denominator there, and it seems that maybe the answer would be to come back and say, yeah, he can get it one day a week or three days a week or one day a month, but not never. And your answer is never. And so don't you have to justify that never is the least restrictive means? Well, Your Honor, the request in this instance and in this case was never. And the never for Mr. Watson in this case took into consideration all of the factors that were testified to that for this particular inmate, it was never. I don't know that they sat down and evaluated candidly for Mr. Watson the one day a week because the question was never asked. The question was asked if he was on the compound or in a minimum or medium security setting, could he be provided it? And both Warden Scarborough and Major Brennan, in fact, thought, yes, we could do it. The other problem that each of those individuals that were in the senior staff at the institution testified to was not only the amount of time, but storing it, how do we deal with it? And then the particularized difficulties of the RTU itself. The RTU, as the court appears to be aware, is in fact where inmates with serious mental illness are housed. And it's not just a serious mental illness, but it's also the maximum security classification. The court below specifically referenced and identified that inmates in the RTU are in fact at a higher risk for misconduct than other inmates, including those in maximum security. So your, sir, let me just make sure I understand your position. First, you're not arguing this was an issue of cost. It was an issue of resources, having the staffing to be able to monitor in response to the requests received as opposed to a different request, such as the once a year usage. I just wanna make sure I understand you correctly. Correct, we looked at it from the perspective, and my clients looked at it from the perspective of 15 minutes every day, and what resources were available in the manner of staffing and locations in the RTU to afford the opportunity for Mr. Watson to have access every day? Because, and let me just make sure I understand it, because that was the nature of the request. The request was a, I'd like to have it every day, consistent with, or I should say weekdays, consistent with the religious tenants. And so now, if your comments were, well, maybe once a year would work, that wasn't the issue in front of the Corps, because that wasn't the request. So we'd, so from a practical point of view, if this afternoon, Mr. Watson chose to make a request for monthly use or yearly use, that would have to be evaluated differently. This case wouldn't answer that, am I right? That would be my position, Your Honor, correct, is the request was a broad brush, everyday request where staffing and security concerns came into play. If the request was made today for once a year use, obviously at that point, the appellees, or I should say the appellees, because the senior staff at the institution has changed, but there would have to be a evaluation of what is Mr. Watson's situation currently, what are the housing concerns currently, and how do we proceed forward? That actually does dovetail into, the argument was made that this is a denial of Mr. Watson's request for it to fill in for the rest of his life, because he's in prison for 101 years. I don't know that that is in fact a correct statement, because much as the court has indicated, circumstances can change. If Mr. Watson gets out of RTU, he's classified at a lower classification, obviously at that point with a change in circumstance, there would have to be a reevaluation of a new request. I don't think that- But you're focusing on request, where LUPA doesn't govern and doesn't concern inmates. It concerns government action. And so it's the government's action, the denial of any ability to ever get Teflon to fill in, that is evaluated for least restrictive means. That's the government's position. He will never get it. And we have to look at whether that government position, regardless of what the request is, it's the government's position that's challenged by this statute. And the question is, is a complete at all times denial the least restrictive means? And I think you've said it's not. Your Honor, based upon the information available to the institution in 2018, they did consider it as the least restrictive means at that time. I have said that looking at it now, there may be an opportunity or a argument to be made that something less could in fact be done. But the testimony of all of the senior staff at the institution at the time was that in 2018, based upon staffing, based upon the unique concerns posed by Mr. Watson, and the staffing in the Building 21 or the RTU unit with all the other duties, it was the least restrictive. It also- How do we resolve this then? Because if I were wearing my old hat, and you guys were in my chambers in my conference room, I will be saying, should we have a conversation, everybody, about how to build a bridge? And is that a remedy here? Can we resolve through communication, conversation? If you don't wanna respond to that directly here, perhaps after the arguments are concluded, we can. But it seems to me that perhaps a resolution could be reached here through conversation, given changed circumstances, what you've described as potential. You're not committing, but potential changed circumstances. Your Honor, the issue before the court below was a singular question of access to the fulfillment. That is what the court below was confronted with. The approach of, is there something that could be done, did not come up. And I don't know for purposes of the appeal, or an appeal where you're looking at what the record is in the decision of the court below, that that type of inquiry is in fact something that the court must undertake. Well, I think, I mean, I might be reading between the lines of what Judge Schwartz says, and maybe I'll just be more explicit. The circuit has a circuit mediation program that has a decently high resolution rate, voluntary resolution rate, settlement rate. Have you explored that? I have not, Your Honor. Okay. I think that's, I mean, I'm just trying to make explicit what might, at least I thought was implicit. Well, we can discuss that maybe after the conclusion of the arguments for a moment or two with counsel, if that's all right. But in the meantime, let's stay focused on, I guess, the legal question in front of us. And if I understand, Mr. Lees, I think what you were about to say was, if we focus only on the appeal and the record in front of this court, the requests made and the type of accommodations that were considered, it's your position, I understand, that the resources were insufficient to accommodate the requests as presented, including modifications of that request, namely not just in your cell, but in other parts of the institution. I just wanna make sure I understand your position. Then I wanna follow up on something that Judge Phipps was alluding to. So, is that your position of what's in front of us to decide? Correct, Your Honor. Okay, now, following up on what Judge Phipps was saying, Judge Phipps was saying that, should the fact that the request was what it was absolve the governmental officials from offering something different? Because it's their obligation to look for the least restrictive option. Your Honor, I think that dovetails into what I was going to raise, and I know that I've already exceeded, I think, my 15 minutes, so I don't wanna continue too much longer. You have, if you could answer that subject for us. Absolutely. I think looking at what the Tefillin is itself and the risks that are posited by that piece of equipment, and that it is not the same as the thin chain that was, in fact, deposited with the court below to review, I think looking at that at this point, based upon the record that exists and looking at the Tefillin itself, that no, I don't think the court should, in fact, reverse or consider that a least restrictive means because the least restrictive means was considered, and at this time, the least restrictive means, or at that time, the least restrictive means was denial altogether. Thank you. Judge Siric, do you have any further questions of counsel? I do not. Great. And Judge Phipps? No, thank you. All right. Thank you very much, counsel. We'll hear Mr. Biggs on rebuttal. Thank you, Your Honors. I'd like to start with some of the questions towards the end of my colleagues' remarks, where the way I have read the record throughout, not only below, but then in the briefing, is that an accommodation can be made, right? And we're in the, if I understand my colleagues' remarks today, placing the, he's placing the burden, defendants are placing the burden on Mr. Watson to propose alternatives or to formulate his request in such a way that can be accommodated by the prison. That is not what our loophole says. That is not the way I read Holt. The burden is on the prison to consider, to evaluate less restrictive means, and then make a determination as to whether those are feasible. That is not what happened below. That is not the defendant's inquiry that they conducted in 2008. Would your client be, would the prison be spinning its wheels, though, if it had done that? Because the religious tenants are daily morning usage, weekday. And if their proposal were only on a day like yesterday, the holiest day of the Jewish calendar, only that day, his response would be, you're not allowing me to fulfill the religious tenant. So would they be spinning their wheels if they went through the back and forth like that? Well, no, Your Honor. In fact, when Mr. Watson first requested, and this is at A346 in the record, he did not say, I need it every day. He asked for access to his defilement. And then it was not, in 2016, complete denial by defendants. And it was not until after this lawsuit was filed that Mr. Watson started to propose alternatives. Mr. Watson said, okay, I could live with supervised access. And then that was denied in the 2018 inquiry. There was no consideration of maybe one day a year, maybe on Yom Kippur. The Yellow Bear case is instructive on this. Then Judge Gorsuch on the 10th Circuit said, this is not a case where we have to deal in absolutes, that maybe there is, as Judge Blitz, I think, very articulately stated, maybe there's something in the middle. But that is not on Mr. Watson to have to propose that. That is on the defendants. That is on the government to satisfy their burden, to consider other alternatives, and then either reject them or find where that somewhere in the middle is. Even though the proposal that would be offered would be inconsistent with the tenant. I mean, could they be accused of being less accommodating because they're proposing something that doesn't fulfill the tenant? Then I think we get, Your Honor, to a question of substantial burden, which is not really the focus of the argument today. Is allowing Mr. Watson one day a week or just on high holy days, is that a substantial burden on his practice of his religion? That is not something that defendants developed below. And frankly, it was not something that was offered by defendants below. And it's this factual inquiry that makes this record difficult for summary judgment. Mr. Watson is being told based on what is unsupport, or I'm sorry, uncorroborated, self-interested, and frankly, self-contradictory in some places testimony without the documents that bear out what defendants are saying, that he has no right to any access because it's dangerous. Well- Judge Sirica, did you have a question? No, I do not. Judge Bibbs? I know I have nothing. Okay, I think we follow your counsel. We thank counsel for their very helpful arguments and discussion with us about these issues. We will take the matter under advisement.